IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

MICHAEL BROWDER,

                Plaintiff

v

CITY OF BOSTON, BISOLA OJIKUTU,
TAMMY PUST, BOSTON FIREFIGHTERS
LOCAL 718 INTERNATIONAL ASSOCIATION
OF FIRE FIGHTERS AFL-CIO, JOHN SOARES,

                Defendants

No. 1:24-cv-11588

**COMPLAINT**

Respectfully submitted,
Plaintiff,
By his attorney,

_____
Ilya I. Feoktistov, Esq.
B.B.O. No. 704458
LAW OFFICE OF ILYA FEOKTISTOV
292 Newbury Street, No. 544
Boston, MA 02115
(617) 462-7938
if@ilyafeoktistov.com

DATED: June 19, 2024.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 3

PARTIES ............................................................................................................ 5

JURISDICTION AND VENUE ............................................................................. 6

STATEMENT OF FACTS ..................................................................................... 8

   I.    Plaintiff's Sincerely-Held Religious Beliefs ...................................... 8

      A.   The Nation of Islam's Religious Beliefs Related to Medical Treatment ......... 8

      B.   Plaintiff's Background and Personal Religious Beliefs ................................. 13

   II.   The City of Boston Appoints a Public Health Commission Executive Director Whose Professional Work Focuses on Combatting Black American "Medical Mistrust" and "Conspiracy Beliefs" ...................................................................... 16

   III.  Plaintiff's Employment History with the City of Boston Fire Department ........ 18

   IV.  Boston Institutes the Vaccine Verification or Required Testing Policy.............. 21

   V.   Plaintiff Requests Religious Accommodation Exempting Him from the Vaccine or Test Policy.......................................................................................... 22

   VI.  Plaintiff is Placed on Unpaid Administrative Leave ............................................ 24

   VII. Plaintiff's Union Refuses to Support Plaintiff's Religious Objections and Advance His Grievance, but Supports Other Firefighters' Medical Objections . 28

   VIII. The City of Boston's Vaccine or Test Policy and Mandatory Vaccine Policy Had No Rational Relationship to its Purpose of Minimizing Exposure to and Transmission of SARS-CoV-2 in City Workplaces............................................ 34

      A.   Definitions of "Infection," "Exposure," "Transmission," "Disease," and "Asymptomatic Transmission" ........................................................................ 34

      B.   COVID-19 Vaccine Was Tested Only for Its Effectiveness at Preventing Disease.................................................................................................................. 37

      C.   Real-World Data Published in 2021 and 2022 Showed that COVID-19 Vaccines Were not Effective at Preventing SARS-CoV-2 Infection or Transmission after Exposure ........................................................................ 38

      D.   Judicial Notice of COVID-19 Vaccine Science is Deeply Tainted by Reliance on Memory-Holed Claims from CDC Websites ............................................ 40

      E.   Popular Understanding of COVID-19 Vaccine Science Is Deeply Tainted by Politics.................................................................................................................. 43

   IX.  Plaintiff is Ordered Back to Work, Declared AWOL, and Terminated .............. 45

COUNT I  42 U.S.C. § 1983 (Substantive Due Process Under Fourteenth Amendment) 48

COUNT II Mass. Gen. Laws. ch. 12, sec. 11I (Massachusetts Substantive Due Process) 51

COUNT III 42 U.S.C. § 1983 (Free Exercise Under First Amendment) ....................... 53

COUNT IV 42 U.S.C. § 1983 (Equal Protection Under Fourteenth Amendment – Disparate Treatment and Impact Based on Race) ........................................................ 56

COUNT V 42 U.S.C. § 2000e-2 (Disparate Treatment Religious Discrimion) ........... 58

COUNT VI Mass. Gen. Laws ch. 151B, § 4 (Disparate Treatment Religious Discrimination) ................................................................................................................ 60

COUNT VII 42 U.S.C. § 2000e-2 (Disparate Treatment and Impact Discrimination Based on Race) ................................................................................................................ 61

COUNT VIII 42 U.S.C. § 12112 (Americans with Disabilities Act) ............................... 63

COUNT IX 42 U.S.C. § 1983 (Procedural Due Process Under Fourteenth Amendment) 63

COUNT X 42 U.S.C. § 1983 (Takings Clause) ................................................................ 65

COUNT XI 42 U.S.C. § 1985 (Conspiracy to Deprive of Equal Protection of Laws) ..... 66

COUNT XII  (Breach of Duty of Fair Representation) .................................................... 67

COUNT XIII (Breach of Contract) ................................................................................... 68

COUNT XIV (Mass. Gen. Laws ch. 12, § 11I) ............................................................... 69

COUNT XIV (Tortious Interference) ............................................................................... 69

JURY DEMAND ............................................................................................................... 70

## INTRODUCTION

"The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes," as well as other compulsory harmful medical treatment, according to centenarian, yet valid Supreme Court law. *See Buck v. Bell*, 274 U.S. 200, 207 (1927) (*citing Jacobson v. Massachusetts*, 197 U.S. 11 (1905).). This principle holds "that the public welfare may call upon the best citizens for their lives," liberties, and happiness in self-defense against public threats like war or disease; and that the public welfare should certainly call upon the weakest for the same. *See id.* ("Three generations of imbeciles are enough.").

When it comes to compulsory COVID-19 vaccination or testing, this principle happens to clash with the sincerely held religious beliefs of Plaintiff Michael Browder based on the word of Allah (God) in the Holy Quran, and the command of his spiritual leader, who has stated publicly and unequivocally about COVID-19 vaccination: "Don't let them vaccinate you."

This principle also clashes with the essential nature of the doctor-patient relationship and the practical reality that disease and war are very different apocalyptic beasts. As relevant here, disease patients are not war fighters; and they are overseen by doctors instead of superior officers. While military professional ethics depend on unilateral unquestioning obedience by lower ranks to superior officers, the ethical integrity of the medical profession depends on its duties to keep the doctor-patient relationship informed, voluntary, and fiduciary.

The twentieth century history of the medical profession in the United States is punctuated by ethical lapses caused by breaches of its professional duties. From eugenics to unconsented irradiation with plutonium, infection with syphilis, and dosing with hallucinogens to compulsory lobotomies, sterilizations, and gynecological experiments; some such breaches are sufficiently notorious to be well within judicial notice. The twenty-first century medical profession's deceptive and coercive responses to the COVID-19 pandemic, like the compulsory sterilization procedures and nonconsensual medical experimentation of the 20th century, severely harmed the profession's ethical integrity by betraying patient autonomy and trust in ways that shock the conscience.

Plaintiff Michael Browder's sincerely-held religious beliefs as a Muslim and member of the Nation of Islam are inseparable from such past betrayals. The Nation was established by its founder in 1930, during the height of the U.S. eugenics movement. It teaches that evil and devilish behavior began with an ancient scientist named Yakub, who tricked thousands of people who lived 6,600 years ago into becoming subjects for his eugenics and population control experiments.

Mr. Browder's religious beliefs, which motivated his refusal to be vaccinated or tested against COVID-19, are the real-world consequences of *Jacobson*, along with subsequent failures

to recognize a fundamental substantive due process right under the Fourteenth Amendment of the U.S. Constitution to refuse unwanted medical treatment. If not the Fourteenth, then the First Amendment of the U.S. Constitution, Title VII of the Civil Rights Act of 1964, and multiple other laws protect Mr. Browder from being denied union representation and discharged from his civil service job for refusing COVID-19 vaccination or testing on instructions of his God (Allah), and his spiritual leader. In violation of Mr. Browder's constitutional, statutory, and common law rights, this is precisely what the Defendants did to Mr. Browder, causing him injury.

## PARTIES

1.    Plaintiff, Michael Browder, Jr., ("Mr. Browder" or "Plaintiff"), was at all times relevant to this complaint a citizen of the United States with a primary domicile in Mattapan, Massachusetts.

2.    Defendant City of Boston ("Boston" or "the City"), is a body politic having its principal office at 1 City Hall Square, Boston, MA 02118. The Boston Fire Department, is a municipal department of the Defendant City of Boston, having its principal office at Boston Fire Department Headquarters, 115 Southampton Street, Boston, MA 02118.

3.    Defendant Bisola Ojikutu ("Dr. Ojikutu") was at all times relevant to this complaint a citizen of the United States, and has been domiciled in Dorchester, Massachusetts since 2021. On July 2, 2021, Dr. Ojikutu was appointed the Executive Director of the Boston Public Health Commission (BPHC), and remains in this position as of the date of this complaint. She is sued in her official and individual capacities.

4.    Defendant Boston Firefighters Local 718, International Association of Fire Fighters, AFL-CIO ("Local 718") is the sole and exclusive bargaining agent of all uniformed employees of the City's Fire Department other than Chief of Department and Deputy and

District Chiefs for purposes of collective bargaining as to wages, hours, standards of productivity and performance and other terms and conditions of employment.

5. Defendant John Soares ("Soares") was at all times relevant to this complaint a citizen of the United States, domiciled in Dorchester, Massachusetts, and a Boston Fire Lieutenant. Between 2020 and 2022, Soares was the President of Local 718.

6. Defendant Tammy Pust ("Pust") was at all times relevant to this complaint a citizen of the United States domiciled in Minneapolis, Minnesota. In October 2021, Ms. Pust was appointed Director of the City of Boston Office of Labor Relations (OLR), and left the position seven months later in April 2022. She is sued in her official and individual capacities.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over Mr. Browder's claims pursuant to 28 U.S.C. §§ 1331 and 1343 under the rights of action available in 42 U.S.C. §§ 1981, 1983, 1985, 2000e-5(f)(3), 12117. Mr. Browder's claims arise under the First, Fifth and Fourteenth Amendments to the U.S. Constitution, as well as under 42 U.S.C. §§ 2000e-2, 12112.

8. This Court has supplemental jurisdiction over Mr. Browder's state law claims pursuant to 28 U.S.C. § 1367.

9. Claims under 42 U.S.C. §§ 2000e-5(f)(3) are properly brought in this Court after the exhaustion of administrative remedies.

   a. Mr. Browder was placed on administrative leave without pay by the City of Boston on October 27, 2021. Mr. Browder filed a timely charge against the City of Boston with the Equal Employment Opportunity Commission (EEOC) pursuant to 42 U.S.C.S. § 2000e-5(b) on March 2, 2022. The EEOC dismissed

Mr. Browder's charge without ruling on the merits and provided Mr. Browder with a "permission to sue" letter on September 7, 2022. Mr. Browder filed a claim for the violation of 42 U.S.C.S. § 2000e-2 in Massachusetts State Court on December 6, 2022, and the claim remains pending as of the date of the instant Complaint.

b. Mr. Browder was terminated by the City of Boston on September 29, 2023. Mr. Browder filed a timely charge against the City of Boston, Local 718, and John Soares with the Equal Employment Opportunity Commission (EEOC) pursuant to 42 U.S.C.S. § 2000e-5(b) on March 27, 2024. The EEOC provided Mr. Browder with a "permission to sue" letter on June 17, 2024.

10.     Claims under Mass. Gen. Laws 151B, § 9 are properly brought in this Court after the exhaustion of administrative remedies.

a. Mr. Browder was placed on administrative leave without pay on October 27, 2021. Mr. Browder filed a timely charge against the City of Boston with the Massachusetts Commission Against Discrimination (MCAD) pursuant to Mass. Gen. Laws ch. 151B, § 5 on March 2, 2022. MCAD dismissed the charge without ruling on the merits and provided Mr. Browder with "permission to sue" letter on April 24, 2023.  Mr. Browder filed a claim for the violation of Mass. Gen. Laws ch. 151B, § 5 in Massachusetts State Court on December 6, 2022, and the claim remains pending as of the date of the instant Complaint.

b. Mr. Browder was terminated by the City of Boston on September 29, 2023. Mr. Browder filed a timely charge against the City of Boston, Local 718, and

John Soares with MCAD pursuant to G.L. c. 151B, § 5 on March 27, 2024.

MCAD provided Mr. Browder with a "permission to sue" letter on June 6,

2024.

11.  Venue in the District of Massachusetts is appropriate pursuant to 42 U.S.C.S. § 2000e-

5(f)(3) because the herein alleged unlawful employment practices by the City of Boston

against Mr. Browder occurred in Massachusetts.

## STATEMENT OF FACTS

### I.   Plaintiff's Sincerely-Held Religious Beliefs

12.  Plaintiff, Michael Browder Jr. ("Mr. Browder"), is a member of a religion called Nation

of Islam ("NOI"), or simply Islam.

13.  Members of NOI refer to themselves as Muslims or Black Muslims. For the purposes of

this Complaint, these terms will be used interchangeably and exclusively to refer to

members of NOI.

### A.   The Nation of Islam's Religious Beliefs Related to Medical Treatment

14.  Black Muslims believe that their religion was founded on July 4, 1930 by Almighty God,

Allah, who appeared in the Person of Master W.F. Muhammad ("Allah") in fulfillment of

Exodus 3:7-8 and Genesis 15:13-14 to liberate Black people.

15.  Black Muslims believe that Allah raised up the Honorable Elijah Muhammad, known as

"the Messenger," to lead NOI. Allah taught the Messenger the wisdom of the scripture

for three years and four months, then departed, leaving Elijah to continue the work of

raising up the Black man and woman in America.

16.  In 1965, NOI published a book by The Honorable Elijah Muhammad, titled Message to

the Blackman in America. In the book, the Messenger set out the NOI belief system,

including the religion's cosmogonic and eschatological beliefs, as revealed to him by Master W.F. Muhammad.

17.     In relevant part, the Messenger wrote in Message to the Blackman in America that the Black nation were the original inhabitants of Earth and the children of the God of Righteousness, who lived mostly satisfied lives until 6,600 years ago, when a god scientist named Yakub was born among the Black nation.

18.     According to the teachings of the NOI, Yakub was born to make trouble, break peace, kill and destroy his own people by creating an enemy for the Black nation.

19.     According to NOI, Yakub studied medicine and created a completely new people, whose descendants are the present White race. To do this, Yakub brought 59,999 of his followers to an island called Pelan, and enlisted members of the healthcare profession to prevent the blackest-skinned members of this isolated island society from reproducing, thereby creating, after 600 years of such selective breeding, the White race:

> He called the doctor first and said: "Doctor, let all the people come to you who want to marry; and if there come to you two real black ones, take a needle and get a little of their blood and go into your room and pretend to be examining it, to see whether their blood would mix. Then, come and tell them that they will each have to find another mate, because their blood does not mix." (It was the aim of Yakub to get rid of the black and he did.) . . . The doctor lied about the blood of the two black people who wanted to marry, that it did not mix. The brown and black could not be married (Brown only). The doctors of today hold the same position over the people. You go to them to get a blood test to see if you are fit to be married. Today, they say it is done to see if there are any contagious germs in the blood. [In] the six hundredth year, Mr. Yakub had an all-pale white race of people on this isle.

20.     The Honorable Elijah Muhammad taught that, after the White race left Pelan and established itself in Western Europe, it was able to subjugate the Black nation for six thousand years with deceit, trickery, and population control by White healthcare professionals.

21. In 1972, just seven years after the Honorable Elijah Muhammad published Message to the Blackman in America, the details of the Tuskegee Study of Untreated Syphilis in the Negro Male ("Tuskegee Study") were leaked to the press, becoming front-page news. NOI's own newspaper called the Tuskegee Study the "U.S. Public Health Service experimental crime of the century."

22. As part of the Tuskegee Study, hundreds of Black male subjects from Alabama infected with syphilis had been denied effective treatment so that study doctors could watch what happened as the disease ravaged their bodies. According to the Quarterly Journal of Economics, "[s]urvivors later reported that study doctors diagnosed them with 'bad blood' for which they believed they were being treated."

23. Revelations that the healthcare profession was infecting Black American males with syphilis without their knowledge and consent served to confirm NOI beliefs. The sexually-transmitted nature of syphilis, combined with revelations of contemporaneous forced sterilization programs designed to reduce the Black populations of Southern states like North Carolina, all had come as real-world proof that, just like The Honorable Elijah Muhammad  had been teaching, "[t]he doctors of today hold the same position over the people" as the Satanic doctors of the evil god scientist Yakub.

24. In 1972, the Honorable Elijah Muhammad wrote:

> The so-called American Negroes, the Lost and Found members of the Nation, the Black Nation, the First and the Last have been used for experimental purposes. They have suffered every evil thing or idea that entered the heart of the slavemaster and his children.  This is going on today as never before, in a wise and scientific way.

25. In 1973, the Honorable Elijah Muhammad wrote that the U.S. government is actively trying to slow the progress of the resurrection of Black people, and that "it has always

been the policy of the white man to use a Black man against a Black man - especially leaders."

26.     The Honorable Elijah Muhammad departed on February 25, 1975.  After the Honorable Elijah Muhammad's departure in 1975, the Honorable Minister Louis Farrakhan ("the Minister") became the next spiritual leader of NOI, and has led the Nation since then until the present. While the Honorable Elijah Muhammad's Mission started with the Black man and woman of America, that Mission has expanded through Minister Farrakhan to the whole of humanity.

27.     Under the Minister, NOI's doctrinal distrust of the U.S. medical establishment has developed into an eschatological belief that the U.S. government is trying to depopulate the world of "indigenous peoples," so as to prevent the foretold coming end of thousands of years of Black subjugation.

28.     In 2013, Minister Farrakhan concluded that childhood vaccinations were a pretext for Black population control:

> We cannot continue to allow our enemies to vaccinate us and our children! They make it "the law"—and it is the law, in some places, that we can't go to school unless we allow them to vaccinate us!  But why should we trust you to vaccinate us and our children?  Our children are all we have:  Should we put our children in the hands of those who have used chemistry and biology, and vaccinations, to lessen our power to reproduce, and to kill us off? No. We must develop the scientists that will examine whatever you offer us, because we know you as a blood shedder, we know you as a liar, we know you as a deceiver and a murderer! So why would we trust you with our precious gift, our children?

29.     On July 4, 2020, Minister Farrakhan gave a major address on the COVID-19 pandemic from his home in Michigan. The Minister referred to Yakub's creation of the White race, reminding his followers that, "[w]hen the White man was made his father was a liar, his

father was a murderer, so they're born with lie and murder in their nature." Minister

Farrakhan also warned:

> I say to my brothers and sisters in Africa, if they come up with a vaccine be careful. Don't let them vaccinate you with their history of treachery through vaccines, through medication. Are you listening? I say to the African presidents, do not take their medications. I say to those of us in America, we need to call a meeting of our skilled virologists, epidemiologists, students of biology and chemistry and we need to look at not only what they give us, we need to give ourselves something better. . . . Dr. Anthony Fauci, Bill Gates and Melinda, you want to depopulate the earth? What the hell gives you that right? Who are you to sit down with your billions and talk about who can live and who should die?

30.     On May 18, 2021, NOI's newspaper, Final Call, published an article titled "From

Tuskegee to Covid-19: U.S. Program of Black Genocide Is Unchanged." The article

concluded:

> The fact is that the Tuskegee doctors were not "studying" a damn thing. They were overseeing a BLACK STERILIZATION program that was entirely consistent with U.S. domestic policy. Today, the Covid-19 "Vaccine" program, its unknown and toxic ingredients, its targeting of Blacks, its secrecy and censorship, its suppression of cures and treatments, and its 3,544 body count make it EXACTLY like Tuskegee. Listen to The Minister: "Don't let them vaccinate you with their history of treachery through vaccines, through medication. … You have NO RIGHT to trust them."

31.     The NOI website contains a prominent section, at noi.org/vaccine, on "The COVID-19

vaccine and U.S. policy of depopulation," which states: "the Honorable Minister Louis

Farrakhan warns the Black community against taking the COVID-19 Vaccine with the

U.S. Government's treacherous history of experimentation, medications, and vaccines."

32.     The contents of the website section, which are also distributed at NOI mosques as

printed brochures, recount "U.S. healthcare practices [that] have historically abused &

killed people of color," including the Tuskegee Study, gynecological experimentation on

enslaved black women, the use of smallpox-infected blankets to kill off Native

Americans, and the nonconsensual sterilization of black and Mexican women.

33. According to NOI's website, the COVID-19 vaccine was designed to accomplish U.S. government policy of ridding "the Earth of the indigenous people":

> The overarching goal is to cull the population of our planet by two to three billion. This includes reducing the United States population by 150 million. Why? White people see their numbers going down and the numbers of the indigenous people, Black, Red and Brown, going up.  In this climate, under this policy, what can we expect from a vaccine that is unalike anything previously made?

34. The website quotes the Honorable Minister Louis Farrakhan: "These are wicked scientists interfering with who and what we are in opposition to our coming back into rulership. This is the Satanic mind. They seek to make us other than ourselves in a permanent way."

35. Pursuant to the Honorable Elijah Muhammad's teaching's NOI believes that Black scientists who support vaccines are not evil, but merely deluded. Minister Farrakhan's spokeswoman has written:

> Until it is proven otherwise, we must presume our people mean us no harm.  It is more likely that the education and training they received make them believe in vaccines and believe this vaccine will benefit them and us. . . .  Our professionals must wake up to the virulent racism which led to the pre-conditions that make us most likely to die from Covid-19.  They must acknowledge that racism itself is a factor in many Covid-19 deaths just by the way we are handled in hospitals. I ask our professional class not to allow themselves to be used to lead our people to slaughter.

36. NOI does not discourage its members from seeking any and all medical help against COVID-19. Indeed, NOI supports and recommends "external measures" to fight COVID-19, such as lockdowns, mask wearing, social distancing, and frequent disinfection. It also supports and recommends the use of non-vaccine therapies, such as Ivermectin.

**B.    Plaintiff's Background and Personal Religious Beliefs**

37. Mr. Browder's family comes from Alabama, and has a long history of fighting for social justice. Mr. Browder's great-grandaunt was the named plaintiff in *Browder v. Gayle*, 142

F. Supp. 707, 710 (M.D. Ala. 1956), *aff'd, Gayle v. Browder*, 352 U.S. 903 (1956) (per curiam).

38.  Mr. Browder's branch of the family moved to Boston during the Great Migration in the early 20th century, where Mr. Browder's father joined the local branch of NOI and met Mr. Browder's mother, who had been raised in the religion as a child.

39.  Mr. Browder grew up in Boston's Dorchester neighborhood and attended NOI's Muhammad Mosque No. 11 with his family, while his father worked as a Boston firefighter.

40.  As a teenager and young adult, Mr. Browder rebelled against his parents' religion and committed many sins. He drank and fathered two children with a woman out of wedlock.

41.  As part of his rebellion against his parents' religion, Mr. Browder joined the 181st Infantry Division of the U.S. Army National Guard in 2002, deploying on combat missions to Iraq and Afghanistan three times over the next ten years.

42.  Mr. Browder's time as a national guardsman was even wilder than his childhood because his sins were sanctioned by the U.S. military and its culture of death. He served as a turret gunner, taking the lives of other people in violation of the teachings of the Honorable Elijah Muhammad and the NOI that "Muslims should not participate in wars that take the lives of humans." When on leave, his company drank and fought as a team, just like on the battlefield.

43.  Prior to his first deployment, Mr. Browder was vaccinated pursuant to the Pentagon's Anthrax Vaccine Immunization Program.

44.  During his deployments in Iraq and Afghanistan, Mr. Browder developed asthma, which he believes was punishment from Allah for the sins of participating in U.S. war efforts,

fathering children out of wedlock, and allowing himself to be vaccinated by the U.S. government.

45.    In 2007, Mr. Browder began dating his wife. She grew very close with Mr. Browder's mother, became Muslim in 2008, and married Mr. Browder in 2010.

46.    After Mr. Browder's last deployment in 2012, during which he missed the birth of his twins, Mr. Browder's wife begged him not to go back into action. They had an angry argument and did not talk for six months. During this period, the mental stress and trauma of his previous three deployments returned all at once. He felt enormous guilt for engaging in the taking of lives of people who also called themselves Muslim.

47.    After the traumatic experience, Mr. Browder's wife reconnected Mr. Browder with his Muslim faith. He stopped drinking, which cost him some of his Army friendships. He also returned to the Black Muslim dietary laws and fasting for a better and healthier life, which Master W.F. Muhammad taught improve mental power and physical appearance, prevent illness, cure ailments, and prolong life.

48.    In addition to his primary residence in Boston, Mr. Browder purchased rural land for his family. There, he and his wife began growing their own natural food and raising chickens.

49.    Mr. Browder exercises, enjoys high physical fitness, and has never fallen ill with a contagious disease since he began following the Black Muslim dietary laws.

50.    Mr. Browder believes that biochemical tests, vaccines, and other countermeasures against contagious disease are sinful because they seek protection from affliction in something other than God.

51.    Mr. Browder and his wife homeschool their four children.

52.     Two twins, born in 2011 during Mr. Browder's last deployment and just prior to Mr.

        Browder returning to his core faith, received initial infant vaccinations.

53.     After 2012, pursuant to Mr. Browder's religious beliefs, the twins received no further

        vaccinations, and he and his wife never vaccinated their subsequent children with any of

        the recommended childhood vaccines.

**II.     The City of Boston Appoints a Public Health Commission Executive Director Whose**
**Professional Work Focuses on Combatting Black American "Medical Mistrust" and**
**"Conspiracy Beliefs"**

54.     On July 2, 2021, the City of Boston appointed Harvard Medical School assistant

        professor Bisola Ojikutu as the Executive Director of the Boston Public Health

        Commission (BPHC). Dr. Ojikutu started her position at BPHC on September 1, 2021,

        and remains in the position as of the date of this complaint.

55.     Dr. Ojikutu's published research largely focuses on ways "to mitigate medical and

        research mistrust" including "vaccine hesitancy," which, she has argued, "is particularly

        prevalent among Black Americans, compared with other races/ethnicities." According to

        Dr. Ojikutu, "[m]edical mistrust has been associated with suboptimal health behaviors

        among Black individuals," and "has been characterized as a thwarter of public health

        mitigation efforts."

56.     In their published research, Dr. Ojikutu and her colleagues have defined Black American

        medical mistrust as the "distrust of health care providers, the health care system, medical

        treatments, and the government as a steward of public health, i[n] a response to current

        and historical systemic racism in health care and society as a whole." (Quotation marks

        and citations omitted.)

57.     According to Dr. Ojikutu and colleagues: "As a multidimensional belief system, medical

        mistrust likely exists on a spectrum from skepticism, to active suspicion, to belief in

        conspiracy theories or secret plots concerning perpetrators, motivations, and *modi*

        *operandi* that are not necessarily apocryphal."

58.     In a peer-reviewed study published on February 1, 2021, Dr. Ojikutu and several

        colleagues argued that during the early stages of the COVID-19 pandemic,

> medical mistrust specific to COVID-19 has been prevalent worldwide and in the
> United States, particularly among Black Americans. Such mistrust has taken the
> form of what has been called "conspiracy beliefs," which are explanations of "the
> origin, treatment, and transmission of infection by reference to the actions of
> powerful people who attempt to conceal their role." [Citations omitted.]

59.     According to Dr. Ojikutu and colleagues, such "conspiracy beliefs are not necessarily

        false, harmful, unjustified, or irrational." Rather, Black American medical mistrust is:

> an understandable, rational, self-protective response to historical and ongoing
> structural and interpersonal discrimination and racism in healthcare, and lack of
> trustworthiness of healthcare systems and institutions in U.S. society . . . [and] a
> form of coping that fulfills epistemic (desire to understand), existential (desire to
> control), and social (desire to maintain a positive view of self or one's in-group)
> motivations under a state of threat or uncertainty. . . [Internal citations omitted.]

60.     According to a qualitative study conducted by Dr. Ojikutu and several colleagues

        between November 2020 and March 2021, Black American vaccine-related medical

        mistrust represents a sincere and meaningful belief system, and "a multifaceted construct

        that includes distrust of healthcare and healthcare providers (to be equitable), the

        government (to provide truthful information), and the vaccine itself (to be safe), as well

        as lack of confidence in vaccine efficacy." Among the participants in Dr. Ojikutu's study,

> almost all pointed to historical and persistent systemic racism as the root cause of
> mistrust of the COVID-19 vaccines. Participants and stakeholders cited various
> examples of racism, mistreatment, experimentation, and injustice from the past by
> government, pharmaceutical companies, healthcare providers and systems, and
> researchers and scientists, as factors that influence Black Americans' decisions

for vaccination and research (e.g., clinical trial) participation. A few participants stated that they did not want to be a "guinea pig." Some interviewees also said that mistrust in Black communities could be explained by persistent and unaddressed injustice and racism across different institutions and sectors of society.

61.    Dr. Ojikutu's study participants "reported perceptions that the vaccines would eventually become mandatory, but many of them felt that such a requirement would cause them to seek workarounds, including alternative employment should their current employer mandated [sic] the vaccine."

62.    In a peer-reviewed article published in January 2022, Dr. Ojikutu reported on the results of a nationwide survey of Black Americans, which she and her colleagues carried out to "enable the tailoring of policy approaches by the community." The survey found that

over a third [of study participants] had low intentions to get vaccinated (11.4% agreed and 23.5% strongly agreed that they would not get a COVID-19 vaccine), and an additional 25.2% said "don't know"; only two-fifths agreed (21.6%) or strongly agreed (18.4%) that they would get vaccinated. In addition, 30.4% said that they were willing to get vaccinated for COVID-19, 31.6% said that they were not willing to get vaccinated, and 37.9% said "don't know/not sure.

63.    In a peer-reviewed article submitted for publication on September 7, 2021 and published on May 3, 2022, Dr. Ojikutu cited the CDC's National Immunization Survey data showing that, as of August 2021, "Black Americans ha[d] the lowest vaccination rate (25.4% fully vaccinated) compared to White Americans (33.7%)."

### III.    Plaintiff's Employment History with the City of Boston Fire Department

64.    In 2007, Mr. Browder joined the City of Boston Fire Department ("BFD") in a firefighter position protected by Massachusetts civil service laws, obtaining tenure after the completion of a one-year probationary period.

65. When Mr. Browder got the job as a firefighter, it was more than just a job—it was the fulfillment of a childhood dream, a family tradition, and a continuation of his commitment to serving the City of Boston.

66. Mr. Browder has had a long-standing employment history with the City of Boston, going back to his teenage years. He started working for the City during Mayor Thomas Menino's tenure in the 1990s as one of the "Boston Red Shirts"—young workers doing community clean-up summer jobs. Before joining the BFD, Mr. Browder worked for the Suffolk County Sheriff's Department, graduating the academy with a drill instructor award.

67. For Mr. Browder, public service was always the path he was going to take. It felt like a natural progression, a way to continue a legacy that was bigger than himself. He felt a lot of pride when he finally got the firefighter job. Not only was he stepping into a role that he had admired since childhood, but he also felt the weight of his family's legacy.

68. Mr. Browder is a second-generation firefighter, proudly following in the footsteps of his father, who dedicated over 32 years to the Boston Fire Department. Some of Mr. Browder's earliest memories are of going with his dad to work, where he got to ride along on calls. These experiences instilled in him a great admiration for the profession.

69. Mr. Browder's father was extremely joyful and proud of him for becoming a firefighter. Mr. Browder is the oldest of nine children, and the pride his parents showed for his accomplishment, as well as the admiration of his siblings, meant a lot to him.

70. During the first years of the COVID-19 pandemic, while most public servants were working from home, Mr. Browder's job was on the front line as a first responder to Boston's fire and medical emergencies. Long before the COVID-19 vaccine was

developed, and before the medical profession even understood the nature of the

pandemic, Mr. Browder was there when his employer needed him.

71.    As the first year of the pandemic raged, Mr. Browder performed hazardous work, which

often exposed him to potential contagious illness, like cardio-pulmonary resuscitation of

individuals suffering from cardiac arrest.

72.    Before every shift, Mr. Browder got up, said his prayers, hugged his wife and kids, and

went to work. It was his faith in God that gave him the strength to do so. It was God and

the teachings of NOI that protected him from bringing anything home to his family. As of

the date of this Complaint, with God's blessings, Mr. Browder has never had COVID-19.



*Mr. Browder, far left, May 2020.*

73. For 19 months during the height of the pandemic, Boston firemen were required to complete a COVID-19 Employee Mandatory Self-Monitoring Checklist in order to prevent transmission of the disease to others.

74. Such "external measures" to fight COVID-19 did not conflict with NOI teachings, so Mr. Browder completed his daily self-monitoring, wore face masks at work, and frequently washed his hands.

**IV.  The City of Boston Institutes the Vaccine Verification or Required Testing Policy**

75. On August 12, 2021, the City of Boston instituted a "Vaccine Verification or Required Testing for COVID-19" ("Vaccine or Test Policy"). Under the Vaccine or Test Policy, Boston first responders were required to "either verify with the City that they are fully vaccinated against COVID-19 or submit COVID-19 test results every 7 days" beginning on October 4, 2021.

76. The stated purpose of the policy was "to minimize exposure to and transmission of the COVID-19 virus in City workplaces by providing occupational protection to all City employees and preventing exposure to members of the community we serve."

77. The Vaccine or Test Policy allowed accommodations based on both medical and religious reasons, except that a "vaccination waiver granted for medical reasons d[id] not exempt the employee from the requirement of regular testing."

78. Under the Vaccine or Test Policy, unvaccinated employees who test positive for COVID-19, would be granted a "90 day freeze" on the testing requirement; and would receive an automatic update to restart submitting negative test results once the freeze end date gets closer.

V.      **Plaintiff Requests Religious Accommodation Exempting Him from the Vaccine or Test Policy**

79.     Mr. Browder's sincerely-held religious beliefs as a Black Muslim believer in Allah (God), and follower of the Honorable Minister Louis Farrakhan require him to honor a direct and unequivocal prohibition "against taking the COVID-19 Vaccine." These beliefs are rooted within NOI's broader origin story, which views Black genocide and subjugation through deceit by the medical scientist Yakub as the original sin of modern Western medicine.

80.     COVID-19 tests utilize biochemical reactions to test bodily fluids for the presence of molecules specific to the virus that causes COVID-19, or for the presence of antibodies produced by the body in response to the virus.

81.     NOI beliefs, as taught by the Honorable Elijah Muhammad in his Message to the Blackman in America, and as Mr. Browder himself understands them, also forbid Mr. Browder from submitting to biochemical tests of his bodily fluids for "any contagious germs."

82.     Because the Vaccine or Test Policy conflicted with his sincerely-held religious beliefs, Mr. Browder submitted a request for a religious exemption from both vaccination and testing to the City of Boston Office of Human Resources on September 27, 2021.

83.     By the time Mr. Browder submitted his request, Dr. Ojikutu had become the executive director of BPHC.

84.     In her published research, Dr. Ojikutu has condescended to Black American mistrust of Western medicine as "as a form of coping that fulfills epistemic (desire to understand), existential (desire to control), and social (desire to maintain a positive view of self or one's in-group) motivations under a state of threat or uncertainty."

85.     Dr. Ojikutu's published work cites to prior research that directly accuses "the Nation of Islam and the Black media" of "diligently serv[ing] as the town crier of the African American community warning of various conspiracies aimed at African Americans."

86.     In her professional work, Dr. Ojikutu has patronized Black American "conspiracy beliefs" related to medical mistrust, and has explored various "interventions," such as cognitive behavioral therapy, for "combatting" such beliefs.

87.     On information and belief, Dr. Ojikutu had the ultimate authority to grant or deny City of Boston employee requests for religious accommodations from the Vaccine or Test Policy; and her decisions to do so were based on the recommendations of Tammy Pust, Boston's Interim Director of Labor Relations, who conducted interviews with employees about their religious accommodation requests.

88.     On information and belief, the City of Boston, Dr. Ojikutu, and Pust denied employee requests for religious accommodations from the Vaccine or Test Policy, if such requests were based on what Dr. Ojikutu defines as "conspiracy beliefs" or as "medical mistrust."

89.     On September 27, 2021, Mr. Browder sent an email to the City of Boston Office of Human Resources, stating: "I, Michael Browder Jr., assert religious exemption from the City of Boston vaccine policy, and the testing policy for COVID-19 due to my sincerely held Muslim beliefs. . . .  I will not waste the time of the Office of Human Resources with an explanation of Islam. However, I will address anyone questioning the religious nature or sincerity of my beliefs."

90.     On October 7, 2021, after Mr. Browder requested an update on his religious exemption request, the City of Boston Office of Human Resources asked Mr. Browder to fill out a religious accommodation request form.

91.    On the request form, Mr. Browder granted the City of Boston permission to ask him more
       specific questions regarding the religious nature or sincerity of his beliefs, as well as to
       obtain "Religion Tenet(s) Documentation" of his beliefs, including the permission to
       confirm "the nature of [his] religious belief(s), practice(s) and accommodation with [his]
       religion's spiritual leader (if applicable) or religious scholars."

92.    Over the next two weeks, Mr. Browder received no updates on the process of his
       religious exemption request or his requests for additional information from the City of
       Boston Office of Human Resources.

**VI.    Plaintiff is Placed on Unpaid Administrative Leave**

93.    On October 25, 2021, fifty-four minutes before the close of business that day, Mr.
       Browder received an email from the director of human resources at BFD. The email
       warned Mr. Browder that he is not in compliance with the Vaccine or Test Policy, and
       informed him that if he does not come "in compliance by the close of business on
       Monday, October 25, 2021, [he] will be placed on unpaid administrative leave at the start
       of [his] work shift beginning on Tuesday, October 26, 2021," and lasting indefinitely.
       According to the email, "[t]his step is being taken in order to ensure the health and safety
       of the City's workforce and the public we serve."

94.    Mr. Browder did not have a work shift on October 26, 2021.

95.    In the evening and early morning hours between October 26 and 27, 2021, a nor'easter
       strengthened into a bomb cyclone and battered Massachusetts with hurricane-force winds
       that gusted to over eighty miles per hour and left more than 600,000 homes and business
       across Massachusetts without power.

96.     On the morning of October 27, 2021, Mr. Browder arrived for his 8:00 a.m. shift at 7:30
        a.m., and immediately responded to reports of downed power lines. When Mr. Browder
        returned to the station close to 9:00 a.m., his lieutenant notified him that the district chief
        had called, and that Mr. Browder had until 9:00 a.m. to be in compliance with the
        Vaccine or Test Policy.

97.     After 9:00 a.m. passed, Mr. Browder was relieved of his duties publicly in front of other
        firefighters and placed on indefinite administrative leave without pay.

98.     As Mr. Browder was removing his equipment from the fire truck, the alarm of a structure
        fire came in and his ladder company responded to the fire one man short of the number
        necessary to safely complete the mission.

99.     After being relieved of duty, Mr. Browder immediately initiated an internal report
        contesting the decision to place him on leave without pay.

100.    On October 28, 2021, Tammy Pust emailed Mr. Browder to set up a meeting for an
        interactive dialogue about his pending religious accommodation request for an exemption
        from the Vaccine or Test Policy.

101.    Mr. Browder requested that the dialogue be conducted in writing, and Pust agreed,
        providing Mr. Browder with a form called "Reasonable Accommodation Interactive
        Dialogue Questions."

102.    The questions form contained no specific questions about Mr. Browder's religious
        denomination or spiritual leader, about the nature of his religious beliefs, or about the
        nature of his religion's conflict with vaccination and testing of bodily fluids for COVID-
        19.

103.  The questions form did not seek any documentation of Mr. Browder's religious tenets or the identities of Mr. Browder's spiritual leaders.

104.  Mr. Browder filled out and returned the form to the director on October 28, 2021.

105.  On October 29, 2021, another City human resources director sent Mr. Browder a denial of his requested accommodation to be exempted from both of the two components of the Vaccine or Test Policy.

106.  According to the denial, Mr. Browder's request for accommodation from the vaccine component of the Policy was denied because that component was voluntary.

107.  According to the denial, Mr. Browder's request for accommodation from the test component of the Policy was denied on the following undue hardship grounds:

> Your work duties require you to be in close physical proximity to other City employees, including those who are scheduled to work the same tours as you do. Your job responsibilities require you to be in close contact with co-workers while in the station and when responding to calls in City vehicles. Your job duties also put you in close physical contact with members of the public on a regular basis. During the COVID-19 pandemic, allowing you to perform your job duties without regular testing for the virus would jeopardize the health of your co-workers and the public we all serve, which constitutes an undue hardship under applicable legal guidance.

108.  The denial letter stated explicitly that the City was not "questioning the sincerity of [Mr. Browder's] stated beliefs."

109.  Boston employed 1,526 firefighters as of January 10, 2022.

110.  Some Boston firefighters are not assigned to duties that require them to be in close physical proximity to other City employees or members of the public. Boston firefighter job assignments vary significantly depending on BFD discretion. Some firefighters are assigned to the Moon Island Training Academy to build, ignite, and clean up after mock structure fires for training events, which does not require close physical proximity to

other persons. Others are assigned to transport gear and heavy equipment, which also can

be done at physical distance from others. Entire fire companies drive around annually to

inspect the City's fire hydrants. At BFD's discretion, it could to assign individuals to

complete the task. Other firefighters are posted as lone watch at the site of downed power

lines or other hazards until police or repair crews show up.

111.   On October 29, 2021, the same date that Mr. Browder's request for a religious exemption

was denied, the deputy chief of personnel at the Boston Fire Department sent Mr.

Browder a written notice that a "noncompliance hearing" before the City of Boston

Office of Labor Relations has been scheduled for November 2, 2024 to determine

whether he has come into compliance with the Vaccine or Test Policy. The notice

threatened that Mr. Browder "will be subject to discipline up to and including termination

and may be kept on unpaid administrative leave" if he does not come into compliance.

112.   On October 29, 2021, Mr. Browder emailed Tammy Pust, stating: "The City of Boston

must immediately place me on a paid leave status or state its intention to terminate me."

113.   When he did not hear back from Pust, Mr. Browder understood that he had been

constructively discharged from his firefighter position.

114.   On November 2, 2021, Mr. Browder's non-compliance hearing was cancelled seven

minutes after it was scheduled to start, with no one but Mr. Browder present.

115.   The non-compliance hearing was rescheduled for November 4, 2021. The hearing officer

refused to review Boston's decision to deny Mr. Browder's religious exemption, stating

that the hearing process does not allow him to reconsider the decision. The hearing lasted

for just twelve minutes; the Boston Fire Department Human Resources Director did not

join the hearing until the very end; and Mr. Browder quickly realized that the hearing was futile. The outcome had been predetermined: he was not going to get his job back.

116.    On November 16, 2021, Mr. Browder applied for unemployment assistance and began looking for a new job.

117.    On November 19, 2021, more than a week after being required to do so by Mass. Gen. Laws ch. 31, § 41, the non-compliance hearing officer informed Mr. Browder he must remain "on unpaid administrative leave until [he] come[s] into compliance with the [Vaccine or Test] Policy" because he has "not been granted an accommodation that excuses [his] noncompliance."

118.    On March 7, 2022, Mr. Browder filed a *pro se* employment discrimination charge with the Equal Employment Opportunity Commission (EEOC). On September 7, 2022, Mr. Browder received a Permission to Sue Letter from the EEOC.

119.    On December 6, 2022, Mr. Browder, by his former counsel, filed Title VII and other claims in state court, where the claims remain pending.

**VII.    Plaintiff's Union Refuses to Support Plaintiff's Religious Objections and Advance His Grievance, but Supports Other Firefighters' Medical Objections**

120.    City of Boston firefighters are represented by a public employee union called Boston Firefighters Local 718, International Association of Fire Fighters ("Local 718").

121.    While employed at BFD, Mr. Browder was required to be a dues-paying member of Local 718, the Boston firefighter union. Boston deducted one and three fifths percent of the annual base salary of a three-year Boston firefighter in dues to Local 718 from Mr. Browder's paycheck.

122.   The collective bargaining agreement (CBA) between Local 718 and the City of Boston for the years 2017-2021 provides that "[e]mployees [covered by this agreement] shall not be disciplined nor discharged except for just cause."

123.   In the CBA, Boston "agrees not to discharge or discriminate in any way against employees covered by this Agreement . . . on the basis of race, religion, color, [or] creed."

124.   The CBA creates a labor grievance procedure for aggrieved member employees, in accordance with statutory requirements for such procedure in Mass. Gen. Laws ch. 150E, §§ 5, 8-9.

125.   After the City of Boston announced the August 12, 2021 Vaccine or Test Policy, Local 718 president John Soares condemned the policy as "a major change in working conditions and violation of an individual's human rights . . . that could have lasting effects not only on our members' health and rights but on the collective bargaining process."

126.   On October 31, 2021, after Mr. Browder was placed on unpaid administrative leave for failing to comply with the Vaccine or Test Policy, an attorney hired by Local 718 informed the Boston Office of Labor Relations that Local 718 would be joining in Mr. Browder's request to "restore him all lost time to date due to the City's placement of him on unpaid leave for noncompliance with the City's Covid-19 Policy." The Local 718 attorney asked that Mr. Browder "be given a reasonable period of time thereafter to consult with his counsel and make a determination as to his available options prior to the City then making a determination as to his compliance and pay status."

127.   On November 17, 2021, Mr. Browder filed a labor grievance with Local 718 against BFD.

128.   Local 718 and/or BFD forwarded Mr. Browder's grievance to Boston's Office of Labor Relations, and a hearing was scheduled on the grievance for December 3, 2021.

129.   On November 23, 2021, BFD's deputy chief of personnel sent an email regarding Mr. Browder's union grievance to Mr. Browder, Local 718 president John Soares, and Local 718 vice-president John Sarro.

130.   Two minutes later, Soares replied to all addressees: "OMG!!!! This dude is a loose cannon".

131.   Ten minutes after Soares's response, Sarro emailed Mr. Browder to state that Mr. Browder is "on his own" and that the "Union is not filing or advancing this grievance" on his behalf.

132.   On December 1, 2021, Mr. Browder withdrew his grievance and cancelled the Office of Labor Relations hearing because Local 718 refused to advance the grievance on Mr. Browder's behalf; and because Tammy Pust, who denied his religious exemption in the first place, was the Director of the Office of Labor Relations. Mr. Browder wrote to Boston, Local 718 and Soares:

> In my 14 years of employment with the City, I have never been suspended, issued a written reprimand, or filed a grievance. I have performed my job throughout the entire pandemic. On October 27, 2021, everything changed. Since then, I have been suspended without pay, issued a written reprimand, subjected to multiple hearings, targeted for additional scrutiny, ridiculed, deemed an undue burden, and ostracized. The City claims this is all because it considers me non-compliant with policy. My sincere religious beliefs exempt me from the policy and I requested reasonable accommodation on 9/27/21 due to those beliefs. I have been up front and transparent about working with the City on this issue. I expected to engage in a dialogue to discuss the specific accommodations I requested which were modeled after the City's own Covid Self-Monitoring Program. Instead, the City's first official action following my request for accommodation was to place me on

unpaid leave. I've been on unpaid leave now for over 30 days with no end in sight. The only option given to me to retain employment is to comply with a policy that violates my faith. This is an impossible position. I feel a target has been painted on my back. I feel the City is looking for any reason to terminate me to hide its discriminatory actions. I feel that because my sincere religious beliefs conflict with City policy, the City chose to never even mention the specific accommodations I requested. Instead, the City chose to attack me and create an environment to force me out. I have zero confidence that I will be treated fair and just by the City, the Department, or the Union. This grievance is withdrawn and the Union has already been notified.

133.   On December 20, 2021, based on Dr. Ojikutu's medical advice, Boston issued a new

policy making COVID-19 vaccination mandatory for all employees ("Mandatory

Vaccine Policy").

134.   According to Dr. Ojikutu, the Mandatory Vaccine policy was a necessary and effective

action to protect Boston employees, provide a safe workplace, ensure the continued

provision of public services, and protect the public, since

testing alone is not sufficient to prevent the spread of the virus . . . [and] continuing the practice of allowing employees to get tested rather than get vaccinated was insufficient to prevent transmission of COVID-19 in the context of the Delta, Omicron, and future variants, or suppress the spread of COVID-19 among City employees during the anticipated seasonal surge. . . .

135.   Dr. Ojikutu also ordered all individuals entering any dining, entertainment, or fitness

establishment in Boston to demonstrate proof of being vaccinated against COVID-19 or

be denied entry.

136.   On December 23, 2021, Local 718, the Boston Police Superior Officer Federation, and

the Boston Police Detectives Benevolent Society called a joint emergency open meeting

for members of Boston's fire and police unions to discuss the Mandatory Vaccine Policy.

137.   Mr. Browder's father had retired as a Boston firefighter in 2019; but he attended the

December 23, 2021 open meeting and stood up to comment about the lack of support for

his son through the Local 718 grievance process.

138.  As Mr. Browder's father was speaking, Local 718 president John Soares began shouting
      at Mr. Browder's father. A police officer who witnessed the altercation described the
      shouting as intended to "intimidate and[/]or shut down the gentleman's statement."

139.  According to the police officer witness, he heard Lieutenant Soares say something to the
      effect of "your idiot f**king son," in reference to Mr. Browder.

140.  The police officer witness confronted Lieutenant Soares. The confrontation became
      extremely heated, but was quickly diffused by bystanders.

141.  Lieutenant Soares has worked with Mr. Browder's father for more than two decades. The
      men did not have a social relationship, but Lieutenant Soares is aware that Mr. Browder's
      family are NOI members.

142.  Lieutenant Soares is not an NOI member.

143.  On December 31, 2021, Local 718 filed an action for injunctive relief against the
      Mandatory Vaccine Policy in Massachusetts Superior Court. Two other Boston police
      unions joined in the litigation, which alleged violations of Massachusetts labor law, as
      well as constitutional issues of "bodily integrity and self-determination."

144.  After failing to obtain preliminary relief in the Superior Court, the three first responder
      unions appealed to a single justice of the Massachusetts Appeals Court and obtained a
      preliminary injunction on February 15, 2022, which restrained Boston from enforcing the
      Mandatory Vaccine Policy by placing unvaccinated employee members of the plaintiff
      unions on unpaid administrative leave.

145.  Speaking to news media after the preliminary injunction was granted, Local 718
      president John Soares implied it would be unjust to terminate city workers for not
      complying with the vaccine mandate, now that cases are decreasing: "We've been on this

rollercoaster ride," he said. "We have members of our department who have been working two years, in the beginning of this [pandemic], unvaccinated."

146. The City of Boston then appealed the preliminary injunction to the full Appeals Court.

147. The Massachusetts Supreme Judicial Court transferred the appeal to itself *sua sponte*, and overruled the single justice on March 30, 2023, vacating the preliminary injunction against the Mandatory Vaccine Policy.

148. After the Supreme Judicial Court vacated the preliminary injunction, Boston never reinstated the Mandatory Vaccine Policy.

149. While the preliminary injunction against the Mandatory Vaccine Policy was in effect, Boston supposedly had returned to its Vaccine or Test Policy, which allowed unvaccinated employees to regularly submit negative COVID-19 test results in lieu of vaccination.

150. However, after the preliminary injunction issued, Boston entirely stopped enforcing its COVID-19 testing requirement for unvaccinated employees.

151. According to a written statement provided to Mr. Browder by one Boston firefighter on August 17, 2022, the firefighter had not submitted a negative COVID-19 test to Boston since June 21, 2022, continued to work in the field, and had received no punitive actions.

152. According to a written statement provided to Mr. Browder by another Boston firefighter on September 24, 2022, the last time that firefighter submitted a negative COVID-19 test was March 8, 2022, and he never had been notified by the City or BFD that he was compliance with the Vaccine or Test Policy.

153. According to a Boston spokesman, no City employee was "held out" on unpaid administrative leave "just for refusing the vaccination," and only three employees were

put on unpaid administrative leave for refusing both vaccination and testing. Mr. Browder was the only firefighter among them.

154.    At least two of the three employees who were put on unpaid administrative leave are Black Americans.

## VIII.    The City of Boston's Vaccine or Test Policy and Mandatory Vaccine Policy Had No Rational Relationship to its Purpose of Minimizing Exposure to and Transmission of SARS-CoV-2 in City Workplaces

155.    There is no rational relationship between COVID-19 vaccination and minimizing exposure to and transmission of  the virus that causes COVID-19, SARS-CoV-2. This is because the COVID-19 vaccines do not prevent exposure to and transmission of the COVID-19 virus, SARS-CoV-2. The vaccines were developed, tested, and shown solely to prevent or reduce the severity of COVID-19 disease, rather than prevent asymptomatic infection or transmission.

156.    Moreover, because vaccinated employees also can become infected with and transmit the SARS-CoV-2 virus, there is no rational relationship between minimizing exposure to and transmission of SARS-CoV-2, on the one hand, and testing *only* unvaccinated employees for SARS-CoV-2 infection, on the other hand.

### A.    Definitions of "Infection," "Exposure," "Transmission," "Disease," and "Asymptomatic Transmission"

157.    SARS-CoV-2 *infection* is defined as the state produced by the establishment and multiplication of the SARS-CoV-2 virus in the body of a person.

158.    *Exposure* to SARS-CoV-2 is defined as a close contact with a known SARS-CoV-2-infected person.

159.  *Transmission*, known colloquially as spread, of SARS-CoV-2 is defined as the establishment and multiplication of SARS-CoV-2 in the body of a person after exposure to another person infected with SARS-CoV-2.

160.  COVID-19 *disease* is defined as a set of symptoms, ranging from mild ones like cough to life-threatening ones like respiratory failure and death, known to be caused by the SARS-CoV-2 virus.

161.  Not all persons infected with SARS-CoV-2 develop symptoms of COVID-19 disease. Therefore, while exposure is a necessary condition precedent to infection, and infection is a necessary condition precedent to both disease and transmission, an infected person who does not have COVID-19 disease still can transmit SARS-CoV-2 to others in what is known as *asymptomatic infection*.



162.  The severity of COVID-19 disease symptoms is exponentially age-specific. Below 30 years of age, the death rate from the disease is extremely low, but doubles with every decade of age after 30. In September 2021, during the peak of the "delta" variant of SARS-CoV-2, a person 30-39 years old, like Mr. Browder, was 17 times less likely to die of COVID-19 than a person older than 75. In January 2022, during the peak of the "omicron" variant of SARS-CoV-2, death from the disease among 30-39 year olds was 59 times less likely than among 75 year olds and older.

**COVID-19 Monthly Deaths per 100,000 Population by Age, United States**
January 01, 2020 - March 31, 2024





| Age Group | Percentage of deaths | Count of deaths |
|---|---:|---:|
| 0-4 years | 0.08 | 893 |
| 5-11 years | 0.03 | 345 |
| 12-17 years | 0.05 | 596 |
| 18-29 years | 0.6 | 7126 |
| 30-39 years | 1.69 | 20109 |
| 40-49 years | 3.94 | 46799 |
| 50-64 years | 17.36 | 206185 |
| 65-74 years | 22.21 | 263887 |
| 75+ years | 54.05 | 642054 |

Deaths by Age Group:

Data from 1,187,994 deaths occurring between January 1, 2020 through March 31, 2024



Centers for Disease Control and Prevention. COVID Data Tracker. Atlanta, GA: U.S. Department of Health and Human Services, CDC; 2024, May 11. https://covid.cdc.gov/covid-data-tracker

### B.      COVID-19 Vaccine Was Tested Only for Its Effectiveness at Preventing Disease

163.   Two primary COVID-19 vaccines were developed for the U.S. market: BNT162b2 by

Pfizer, Inc. and BioNTech. Inc. ("Pfizer Vaccine"), and mRNA-1273 by Cambridge-

based Moderna, Inc. ("Moderna Vaccine").

164.   Neither the Pfizer nor the Moderna Vaccine clinical trials assessed if the vaccines could

reduce infection or transmission after exposure to SARS-CoV-2, and neither the

companies nor the government ever claimed they did.

165.   The two COVID-19 vaccines were tested only for their efficacy at preventing COVID-19

disease with symptoms of various severity, or *symptomatic infection*.



166.   On Dec. 3, 2020, Pfizer's CEO, Albert Bourla, told NBC News it was still unknown if

vaccinated people could be infected with SARS-CoV-2 and transmit it to others. "I think

this is something that needs to be examined. We are not certain about that right now," he

said.

167.   When the Food and Drug Administration issued an emergency use authorization for the

Pfizer Vaccine on December 11, 2020, the authorization clearly disclaimed: "At this

time, data are not available to make a determination about how long the vaccine will

provide protection, *nor is there evidence that the vaccine prevents transmission of SARS-*

*CoV-2 from person to person*." (Emphasis added.)

C.     **Real-World Data Published in 2021 and 2022 Showed that COVID-19 Vaccines Were not Effective at Preventing SARS-CoV-2 Infection or Transmission after Exposure**

168.   Among all the science, technology, engineering, and mathematics (STEM) periodicals in the world, the periodicals New England Journal of Medicine and Cell, respectively, published the third and fourth highest-cited science, technology, engineering, or mathematics articles of 2021 and 2022.

169.   The New England Journal of Medicine is based in Boston, MA and published by the Massachusetts Medical Society.

170.   Cell is based in Cambridge, MA.

171.   On February 18, 2021, Cell reviewed the then-current science on "[a]daptive immunity to SARS-CoV-2 and COVID-19." The review noted than neither COVID-19 vaccine was tested for transmission, and also that the Pfizer Vaccine's "protection was reported based on symptomatic cases, not number of infections. . . [as] it would be extraordinarily challenging to check 40,000 people for SARS2 infections continuously for months."

172.   The February 18, 2021 Cell article explains the logical relationships among the terms infection, transmission, and disease, as they relate to a vaccine's efficacy:

> Notably, a vaccine that can prevent severe disease, or even most URT [upper respiratory tract] symptomatic diseases, would not necessarily prevent transmission of virus. For example, the current pertussis vaccine prevents clinical disease but not infection, and probably not transmission, and much SARS-CoV-2 transmission occurs early, during the pre-symptomatic phase. Several non-human primate COVID-19 vaccine studies are consistent with the possibility of COVDI-19 [sic] vaccines preventing severe disease in humans but possibly not preventing URT infection.

173.   On March 12, 2021, a consortium of scientists from Massachusetts General Hospital's Vaccine and Immunotherapy Center and Department of Medicine, from the Massachusetts General Hospital for Children, from Brigham and Women's Hospital in

Boston, from the Dana Farber Cancer Institute in Boston, led by the Ragon Institute of MGH, MIT, and Harvard, among others, e-published an article in Cell titled *Multiple SARS-CoV-2 variants escape neutralization by vaccine-humoral immunity*.

174. "Neutralization" is a chemical test used to determine vaccine efficacy. At the time that the article was published, highly infectious SARS-CoV-2 strains like delta and omicron had not yet been isolated, and the relatively-weaker "beta" strain, also known as B.1.351, was the most infectious pandemic variant. The April 29, 2021 article found that the Pfizer and Moderna vaccines were extremely poor at neutralizing the beta variant, with the implication that new variants would be even better at escaping neutralization by the vaccines.



Wilfredo F. Garcia-Beltran*, et al., *Multiple SARS-CoV-2 variants escape neutralization by vaccine-induced humoral immunity,* 184 Cell 2372 (2021).

175. The April 29, 2021 Cell article concluded:

Taken together, our results highlight that BNT162b2 [Pfizer] and mRNA-1273 [Moderna] vaccines achieve only partial cross-neutralization of novel variants and support the reformulation of existing vaccines to include diverse spike sequences.

Ultimately, development of new vaccines capable of eliciting broadly neutralizing antibodies may be necessary to resolve the ongoing pandemic.

176. On March 2, 2022, the New England Journal of Medicine published the results of a study testing the effectiveness of the Pfizer and Moderna vaccines at preventing symptomatic COVID-19 disease caused by the SARS-CoV-2 "omicron" variant, also known as B.1.1.529. According to the results, the vaccines' "effectiveness was lower for the omicron variant than for the delta variant at all intervals after vaccination and for all combinations of primary courses and booster doses investigated."

**D.     Judicial Notice of COVID-19 Vaccine Science is Deeply Tainted by Reliance on Memory-Holed Claims from CDC Websites**

177. The City of Boston and Dr. Ojikutu—as well as at least 185 opinions by various courts across various United States jurisdictions, including by the Massachusetts Supreme Judicial Court—all reference a particular U.S. Centers for Disease Control (CDC) webpage as primary support for their conclusions that the COVID-19 vaccine is effective at minimizing exposure to and transmission of SARS-CoV-2: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html ("CDC Vaccine Webpage"). *See, e.g.*, *Foster v. Commissioner of Correction*, 488 Mass. 643, 654 (2021) (citing CDC Vaccine Webpage) ("The scientific community has recognized that vaccination is highly effective in protecting against COVID-19 infection. . .").

178. At least 901 opinions by courts across various United States jurisdictions rely on COVID-19 vaccine information published online by the CDC.

179. Since it was published on March 5, 2021, the information on the CDC Vaccine Webpage has changed five times—on August 15, 2021, December 23, 2021, June 23, 2022, March 23, 2023, and March 7, 2024—without any reason given for the changes.

180.    On March 5, 2021, the CDC Vaccine Webpage was published online for the first time,

under the title "COVID-19 Vaccines Work." The webpage stated categorically that

"COVID-19 vaccination prevented most people from getting COVID-19." The March 5,

2021 CDC Vaccine Webpage also stated: "New variants of the virus that causes COVID-

19 illness have emerged. . . . Current data suggest that COVID-19 vaccines used in the

United States should work against [new] variants."

181.    Just one week later, Massachusetts scientists warned in Cell Magazine: "[u]ltimately,

development of new vaccines . . . may be necessary" due to the emergence of new

variants.

182.    On August 11, 2021, the CDC published a separate webpage called "Virus Variants" on

the internet. In the Virus Variants webpage, the CDC admitted: "Anyone with Omicron

infection, regardless of vaccination status or whether or not they have symptoms, can

spread the virus to others."

183.    Yet the editors of the CDC Vaccine Webpage continued giving entirely contradictory

claims. On August 16, 2021, the CDC Vaccine Webpage was edited again to falsely

reassure the public that "FDA-authorized COVID-19 vaccines help protect against Delta

and other known variants," and that "COVID-19 vaccination can reduce the spread of

disease overall, helping protect people around you."

184.    In its August 16, 2021 edit of the Vaccine Webpage the CDC also added the false claim

that:

> "In addition to providing protection against COVID-19, there is increasing
> evidence that COVID-19 vaccines also provide protection against COVID-19
> infections without symptoms (asymptomatic infections). COVID-19 vaccination
> can reduce the spread of disease overall, helping protect people around you."

185.    On December 23, 2021, the CDC Vaccine Webpage was edited again to falsely claim: "In addition to data from clinical trials, evidence from real-world vaccine effectiveness studies show that COVID-19 vaccines help protect against COVID-19 infections, with or without symptoms (asymptomatic infections)."

186.    At the same time, the CDC Vaccine Webpage finally began to walk back some of its initial claims, stating: "While COVID-19 vaccines are effective, studies have shown some declines in vaccine effectiveness against infections over time, especially when the Delta variant was circulating widely."

187.    On June 23, 2022, the CDC Vaccine Webpage was edited for the third time. This version conceded that the vaccines were actually rather ineffective, either against SARS-CoV-2 infection or against mild to moderate COVID-19 disease symptoms:

>       COVID-19 vaccines are working well to prevent severe illness, hospitalization, and death. However, public health experts see reduced protection over time against mild and moderate disease, especially among certain populations. . . . COVID-19 vaccines used in the United States continue to protect against severe disease, hospitalization, and death from known circulating variants. They may not be as effective in preventing infection from these variants.

188.    On March 23, 2023, the CDC Vaccine Webpage was edited for the fourth time to entirely remove all claims about COVID-19 vaccine effectiveness and the claim that "COVID-19 Vaccines Work."

189.    The March 23, 2023 version of the CDC Vaccine Webpage contains links to another CDC webpage on vaccine effectiveness studies, which states that the CDC's criteria for testing COVID-19 vaccine effectiveness are: a) "Critical illness or death due to COVID-19"; b) "Hospitalization for COVID-19"; c) "Medically attended COVID-19 (e.g., urgent care and emergency department visits)"; and d) "Symptomatic SARS-CoV-2 infection".

There is no mention of spread, transmission, or asymptomatic infection being used by the CDC as criteria for monitoring vaccine effectiveness.

190. On March 7, 2024, the CDC Vaccine Webpage was edited for the fifth time, this time insubstantially.

191. According to Pew Research Center polling data, the percentage of U.S. adults who lacked confidence that medical scientists will act in the best interest of the public doubled from 11 % to 22 % during the time period between April 2020 and December 2021, and remains at 22 % as of the latest polling.



**Majorities of Americans say they have at least a fair amount of confidence in scientists, but ratings have fallen since early in the coronavirus outbreak**

*% of U.S. adults who have ___ of confidence in the following groups to act in the best interests of the public*

● A great deal   ● A fair amount   ● Not too much/No confidence at all

E. **Popular Understanding of COVID-19 Vaccine Science Is Deeply Tainted by Politics**

192. On July 4, 2021, U.S. President Joseph Biden (President Biden) stated that the United States is "closer than ever to declaring our independence from a deadly virus [SARS-CoV-2]. . . . It no longer controls our lives.  It no longer paralyzes our nation.  And it's within our power to make sure it never does again."

193. This prediction quickly turned out to be false. In the second week of July 2021, as the delta variant began to spread through the U.S. population, the nation's seven-day average

of new COVID-19 cases increased by nearly 70 %. Hospitalizations and deaths also

began to increase. As of the date of this Complaint, total U.S. deaths from COVID-19 are

approaching double their number on July 4, 2021.

194.    In correlation with the disease's resurgence, American society began to exhibit a

phenomenon that is consistent with many past historical and literary descriptions. *See,*

*e.g.*, Leviticus 16:20-22.

195.    On July 16, 2021, President Biden stated: "The only pandemic we have is among the

unvaccinated."

196.    On July 25, 2021, New York Times science reporter Apoorva Mandavilli published a

"news analysis" article in the New York Times titled: "The Delta Variant Is the Symptom

of a Bigger Threat: Vaccine Refusal."

197.    In her July 25, 2021 article, Mandavilli claimed: "The unvaccinated will set the country

on fire over and over again. And they will not be the only ones who are singed."

198.    On December 14, 2021, as the omicron variant became the dominant SARS-CoV-2

variant circulating in the United States, President Biden stated in an interview that

vaccinated persons "do not spread the disease to anyone else." President Biden added:

> This is a pandemic of the unvaccinated, the unvaccinated. Not the vaccinated, the
> unvaccinated. That's the problem. Everybody talks about freedom and not to have
> a shot or have a test. Well guess what? How about patriotism? How about making
> sure that you're vaccinated, so you do not spread the disease to anyone else."

199.    The false claim that the vaccinated do not spread COVID-19 to others, but the

unvaccinated do, became conventional wisdom, with national media pundits, journalists,

celebrities, politicians, and even courts using the false claim to mercilessly scapegoat

persons who were not vaccinated against COVID-19 for the failure to end the pandemic.

**IX.    Plaintiff is Ordered Back to Work, Declared AWOL, and Terminated**

200.    Boston and Dr. Ojikutu ended the Vaccine or Test Policy on May 11, 2023.

201.    On May 24, 2023, Boston requested that Mr. Browder to return to work by May 31, 2023, and told Mr. Browder: "the City takes the position that you are not entitled to any back pay for the period of your unpaid administrative leave . . . [due to your] lack of compliance with the City's Vaccination Verification or Required Testing for COVID-19 Policy."

202.    Mr. Browder had already filed for unemployment insurance, as well as an EEOC complaint and a state court lawsuit against Boston for terminating him. He had already applied for multiple jobs elsewhere. He considered himself constructively discharged since October 27, 2021, when he was placed on indefinite unpaid administrative leave.

203.    Mr. Browder replied to Boston that "it is the Department and the City's duty to address the discriminatory and retaliatory behavior that [he] ha[s] endured and to find a just resolution to this situation."

204.    On June 28, 2023, BFD's deputy chief of personnel ordered Mr. Browder to report to him on July 12, 2023 to discuss Mr. Browder's work status and return to duty, stating that "[f]ailure to report as directed on this date will be considered being absent without leave."

205.    On September 29, 2023, BFD's deputy chief of personnel notified Mr. Browder that he is no longer employed by Boston due to being on an unauthorized absence since July 12, 2023.

206.    Prior to being terminated from BFD, Mr. Browder had never faced termination from any job.

207. The impact of losing his job as a Boston firefighter has had deep personal effect on Mr. Browder. Firefighting is what he did for the better part of his adult life until it was just snatched away, and he was powerless to protect himself or his family from the impact.

208. Plaintiff had been attempting to pass BFD's test for promotion to lieutenant and intended to work until retirement at sixty-five years old, at which time he would have been eligible for a pension of 80% of his three highest-income years of work.

209. Not only did losing his job turn his personal life upside down, but it snatched away Mr. Browder's identity, his place in his community, and his social circle—things he had worked for and earned by treating others in a way he would want to be treated if he were them.

210. Being a firefighter was what Mr. Browder did. It was him, just like a hammer is a hammer *because* it hammers. He used to feel a strong sense of purpose and belonging. Now, he just feel isolated and diminished.

211. Mr. Browder's colleagues at the firehouse were more than just coworkers, they were his social circle, a brotherhood. After being relieved of duty publicly in front of them, those bonds began to dissolve, leaving a void where his social circle used to be.

212. Even outside the firehouse, people knew Mr. Browder as the firefighter and respected him for it. His picture was on a sign, and on flyers at the Boston Firefighters Credit Union in Dorchester. People who knew him and members of the public who did not know but recognized him would have a little fun cracking jokes and teasing him about that picture of him they saw hanging around.



213.   Now, everything has changed. Mr. Browder runs into people he knows who have no idea
       he's no longer a firefighter. When they ask him how things are at work, Mr. Browder
       often just skips over the question, but it always brings him extreme emotional pain.
       Telling people he got fired is like announcing to the world that he lost a part of his
       identity—that he failed. People just look at him with a mix of pity and confusion, because
       him getting fired just does not make sense. The pride he carried in his role, which was a
       big part of his self-worth, was completely shattered by getting fired.

214.   Mr. Browder's ability to find work as a firefighter in another department has been
       severely curtailed. A Boston firefighter with almost fifteen years of experience normally
       is highly competitive in hiring by other municipality fire departments. Yet, Mr. Browder
       has been unable to find a job with any fire department or fire marshal in Massachusetts
       and New Hampshire to which he applied.

215.   Mr. Browder's termination by Boston has featured prominently in most of Mr. Browder's
       job interviews.

216.  Mr. Browder applied for the New Hampshire Fire Investigator position on August 7, 2022. He successfully completed the physical fitness test, the written exam, and was invited to proceed to the three-member oral board. Afterward, he was informed that he would be meeting with the agency directors. Following the meeting, Plaintiff received an email from the Deputy Fire Marshal stating that he would no longer be considered for the position. Plaintiff believes that the NH Fire Marshal's Office rejected him due to the negative impact on his record caused by the City of Boston and the Boston Fire Department.

217.  Mr. Browder's termination by Boston is like having a felony on the record, since other municipal fire departments respect a big department like Boston. If Boston fires an employee, it carries weight.

218.  Explaining his situation over and over in job interviews has been an uphill battle, which left Mr. Browder emotionally exhausted after each failure until he finally gave up.

219.  Mr. Browder is turning 40 in 2024. At his age, and after being terminated by Boston, is unlikely that he will ever find employment as a firefighter.

220.  On June 17, 2024, Mr. Browder started his first day of work since Boston placed him on unpaid administrative leave.

221.  Mr. Browder now works as a mail carrier for the United States Postal Service.

## COUNT I
### 42 U.S.C. § 1983 (Substantive Due Process Under Fourteenth Amendment)

222.  Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-221 as if fully set forth herein.

223.  In the decades since Jacobson was decided, the U.S. Supreme Court has "assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse

unwanted lifesaving medical treatment," or medical treatment of other kinds. *See Washington v. Glucksberg*, 521 U.S. 702, 705 (1997). *See also Washington v. Harper*, 494 U.S. 210, 221-222 (1990).

224.    The right to be free from nonconsensual medical attention and/or intentional medical harm at the hands of a healthcare professional is so deeply rooted in the American people's conscience and traditions, firmly entrenched in American tort law, and securely grounded in the earliest common law as to be fundamental. Even the Hippocratic Oath, written in Ancient Greece several centuries before the Common Era, recognizes this right by obligating the novice doctor to do no harm or injustice to the patient.

225.    Historically and during the COVID-19 pandemic, whenever they occurred, deviations away from Anglo-American informed consent bioethical traditions and toward more authoritarian doctor-patient relationships have undermined the ethical integrity of the medical profession by betraying patient trust and autonomy.

226.    The City of Boston, Dr. Ojikutu, and Pust deprived Plaintiff of a recognized liberty interest that is so deeply-rooted as to be fundamental.

227.    Plaintiff's racially- and religiously-based medical mistrust is inseparable from such historical government betrayals, adding particular force for the argument that the right to refuse unwanted medical treatment should be recognized as fundamental.

228.    Vaccination, combined with testing only for unvaccinated employees, were neither narrowly tailored to serve a compelling government purpose nor rationally related to the stated purpose of "minimiz[ing] exposure to and transmission of the COVID-19 virus in City workplaces." Contemporary credible Massachusetts-based research was showing that COVID-19 vaccines did not prevent asymptomatic infection with and transmission

of the COVID-19 virus by vaccinated individuals. Dr. Ojikutu and the City of Boston knew or should have known about this research when they issued the Vaccine or Test Policy and the Mandatory Vaccine Policy.

229.  The City of Boston, Dr. Ojikutu, and Pust violated Plaintiff's fundamental right to refuse lifesaving medical treatment in ways that shock the modern conscience.

230.  The City of Boston and Dr. Ojikutu knew or were deliberately indifferent to contemporary scientific research, much of it being performed and published by Boston and Cambridge scientific institutions, which contradicted the CDC's inaccurate and since-retracted claims that a) COVID-19 vaccines were tested to provide protection from SARS-CoV-2 asymptomatic infection or transmission, and b) COVID-19 vaccines continued to provide protection from new SARS-CoV-2 variants. The City of Boston and Dr. Ojikutu nevertheless mandated the COVID-19 vaccine for Boston employees (and for all persons engaged in commercial activity in Boston) based on knowingly-false claims about the COVID-19 vaccine's effectiveness at achieving the mandate's purpose.

231.  Not only were the City of Boston, Dr. Ojikutu, and Pust active participants in one of the greatest government intrusions on civil liberties in the peacetime history of this country, but they were also active participants in one of the country's greatest medical hoaxes. As Dr. Ojikutu's own research indicates, medical distrust has extremely negative effects on public health. Yet her mandates, along with the mandates of government scientists across the country, contributed to a doubled distrust of medical science among the U.S. population from the beginning of the pandemic to December 2021.

232.  In justifying their mandates in litigation and under oath with long-ago deleted false claims by the CDC, Dr. Ojikutu and the City of Boston contributed to polluting the stare

decisis of this country's courts with opinions that are destined to form a remarkable feature in the history of American jurisprudence.

233.   By placing Plaintiff on indefinite administrative leave without a decision on his religious accommodation request until he agrees to undergo vaccination against and/or tests for the presence of the SARS-CoV-2 virus against his will, the City of Boston Dr. Ojikutu, and Pust deprived Plaintiff of his fundamental right to refuse medical treatment, under color of law, in violation of his substantive due process rights under the Fourteenth Amendment, causing him economic and emotional injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that the City of Boston, Dr. Ojikutu, and Tammy Pust deprived Plaintiff of his fundamental right to refuse medical treatment, under color of law, in violation of his substantive due process rights under the Fourteenth Amendment, causing him economic and emotional injury; and 2) award Mr. Browder actual damages against the City of Boston, Dr. Ojikutu,and Tammy Pust with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Mr. Browder's rights.

## COUNT II
### Mass. Gen. Laws. ch. 12, sec. 11I (Massachusetts Substantive Due Process)

234.   Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-233 as if fully set forth herein.

235.   Mr. Browder's property interest in his employment as a tenured Boston firefighter was protected by the Massachusetts civil service law, Mass. Gen. Laws ch. 31, § 1 et seq., and by Fourteenth Amendment to the U.S. Constitution.

236.   The Massachusetts Supreme Judicial Court recognizes a penumbral constitutional right of privacy to reject medical treatment. Under Massachusetts law, this right is balanced against very limited and carefully scrutinized overriding state interests in (1) the preservation of life; (2) the prevention of suicide; (3) the maintenance of the ethical integrity of the medical profession; and (4) the protection of innocent third parties.

237.   Mr. Browder wants to live; declining life-sustaining medical treatment may not properly be viewed as an attempt to commit suicide; and where a competent adult refuses medical treatment for himself, the State's interest in preserving the particular patient's life will not override the individual's decision.

238.   Mr. Browder has never been diagnosed with COVID-19, never called out sick because of COVID while working for the City of Boston during the COVID-19 pandemic, and maintains high physical fitness.

239.   There was no rational relationship between the protection of innocent third parties from exposure to and transmission of the COVID-19 virus, on the one hand, and either vaccination or testing only unvaccinated employees for the presence of the COVID-19 virus, on the other hand. The COVID-19 vaccines were never tested for effectiveness at preventing asymptomatic infection or transmission, and contemporaneous scientific data showed that the COVID-19 vaccines did not prevent asymptomatic infection with or transmission of the COVID-19 virus.

240.   The state interest in preserving the ethical integrity of the medical profession weights against the Vaccine or Test Policy and the Mandatory Vaccine Policy.

241.   Because no state interest counterbalances Mr. Browder's Massachusetts constitutional right to decline medical treatment, and because Dr. Ojikutu and Pust forced Mr. Browder

to choose between exercising this right, on the one hand, or his various constitutional and statutory property rights in his tenured employment, on the other hand, Dr. Ojikutu and Pust interfered with Mr. Browder's substantive due process rights under the Massachusetts Constitution through threats, intimidation, and/or coercion, causing Mr. Browder injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that Dr. Ojikutu and Tammy Pust interfered with Mr. Browder's substantive due process rights under the Massachusetts Constitution through threats, intimidation, and/or coercion, causing Mr. Browder injury; and 2) award Mr. Browder actual damages against Dr. Ojikutu and Tammy Pust, with interest, reasonable attorney's fees and costs pursuant to Mass. Gen. Laws ch. 12, § 11I, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Mr. Browder's rights.

## COUNT III
### 42 U.S.C. § 1983 (Free Exercise Under First Amendment)

242.   Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-241 as if fully set forth herein.

243.   Under the Free Exercise Clause, the government may not lend its power to one side or the other in controversies over religious authorities or dogma; and the government may not impose special disabilities on the basis of religious views or religious status. Any law or its execution must be neutral and generally-applicable.

244.   Contemporaneously to administering and/or enforcing the Vaccine or Test Policy and the Mandatory Vaccination Policy for the City of Boston, Dr. Ojikutu researched "interventions" to combat Black American medical mistrust and beliefs "in conspiracy

theories or secret plots concerning perpetrators, motivations, and modi operandi" concerning COVID-19 vaccines.

245.   Dr. Ojikutu is motivated by a professional interest in combating vaccine hesitancy, medical distrust, and certain sincerely-held beliefs among Black Americans, which Dr. Ojikutu has disparaged as "conspiracy beliefs" or "conspiracy theories."

246.   As part of Dr. Ojikutu's efforts to combat Black American mistrust and "conspiracy theories" concerning COVID-19 vaccines, Dr. Ojikutu, Pust, and the City of Boston refused to grant religious exemptions from the Vaccine or Test Policy to Black Americans whose religious or otherwise sincerely-held beliefs included medical mistrust, vaccine hesitancy, and/or so-called "conspiracy theories" about the COVID-19 vaccine.

247.   Mr. Browder's Black Muslim religion views mistrust in the medical profession as a sine qua non to physical and spiritual salvation. The Black Muslim religion indeed explains the origin, treatment, and transmission of infection, as well as testing therefor, by reference to the actions of powerful people who attempt to conceal their role. The religion's spiritual leader, Minister Louis Farrakhan, indeed preaches a theory that the COVID-19 and other vaccines are a conspiracy by the servants of a demonic medical scientist to depopulate the world of indigenous people and thereby to prevent Black people from coming back into dominion over the world.

248.   Because of Dr. Ojikutu's professional efforts focus on combatting Black American medical mistrust, on the one hand, and because medical mistrust is an essential tenet of Mr. Browder's Black Muslim religion, on the other hand, Dr. Ojikutu, Pust and the City of Boston decided not to grant Mr. Browder the religious exemption that was generally

available for other religious beliefs that were not based on medical mistrust born of the historical mistreatment of one's race by those in authority.

249.   Dr. Ojikutu, Pust, and the City of Boston also did not administer the Vaccine or Test Policy in a neutral fashion. All three Boston employees who were compelled by their religions to object to the testing requirement of the Vaccine or Test Policy were placed on indefinite unpaid administrative leave. Those Boston employees who did not object, but simply failed to comply with testing requirement, suffered no consequences.

250.   The Vaccine or Test Policy neither was narrowly tailored to serve a compelling government purpose nor was rationally related to the stated purpose of "minimiz[ing] exposure to and transmission of the COVID-19 virus in City workplaces." Dr. Ojikutu and the City of Boston knew or should have known about contemporary research showing that COVID-19 vaccines did not prevent asymptomatic infection with and transmission of the COVID-19 virus by vaccinated individuals.

251.   By failing to administer the Vaccine or Test Policy in a generally-applicable manner and neutral manner, Dr. Ojikutu, Pust, and the City of Boston deprived Mr. Browder of his First Amendment rights under color of law, causing Mr. Browder injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that the City of Boston, Tammy Pust and Dr. Ojikutu deprived Mr. Browder of his First Amendment rights under color of law, causing him injury; and 2) award Mr. Browder actual damages against the City of Boston, Tammy Pust, and Dr. Ojikutu, with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Mr. Browder's rights.

**COUNT IV**
**42 U.S.C. § 1983 (Equal Protection Under Fourteenth Amendment – Disparate Treatment and Impact Based on Race)**

252.  Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-251 as if fully set forth herein.

253.  To assert a disparate treatment equal protection claim, a plaintiff must state facts sufficient to show that, as compared to others similarly situated, the plaintiff was treated differently under the color of state law based on an improper consideration, such as race. Under the Fourteenth Amendment, government officials may not use race as a negative, or for any sort of stereotype.

254.  The Vaccine or Test Policy neither was narrowly tailored to serve a compelling government purpose nor was rationally related to the stated purpose of "minimiz[ing] exposure to and transmission of the COVID-19 virus in City workplaces." Dr. Ojikutu and the City of Boston knew or should have known about contemporary research showing that COVID-19 vaccines did not prevent asymptomatic infection with and transmission of the COVID-19 virus by vaccinated individuals.

255.  Dr. Ojikutu is motivated by a professional interest in combating vaccine hesitancy, medical distrust, and certain sincerely-held beliefs among Black Americans, which Dr. Ojikutu has disparaged as "conspiracy beliefs" or "conspiracy theories."

256.  Dr. Ojikutu does not have a professional interest in combatting vaccine hesitancy, medical distrust, and certain sincerely-held beliefs among other races.

257.  Between November 2020 and March 2021, Dr. Ojikutu discovered that vaccine hesitancy and medical mistrust are "particularly prevalent among Black Americans, compared with other races/ethnicities," that Black Americans are significantly less likely to get vaccinated against COVID-19 than other racial groups; and that many Black Americans

would feel pressured to seek "alternative employment should their current employer mandated [sic] the vaccine."

258.   In contrast, Dr. Ojikutu's research showed that white Americans and members of other minority races are significantly less likely to hold "conspiracy beliefs" about COVID-19 vaccines, and therefore significantly more likely to get vaccinated.

259.   Armed with this information, and after being appointed as the Executive Director of the Boston Public Health Commission in July 2021, Dr. Ojikutu refused to grant sincerely-held belief exemptions from Boston's Vaccine or Test Policy to three Boston employees, at least two of whom were Black American. Dr. Ojikutu then mandated that Boston employees must get the COVID-19 vaccine, and also banned all unvaccinated persons from various commercial establishments in the City of Boston.

260.   Mr. Browder is a Black American employee of Boston. He was forced to seek alternative employment after the City of Boston, Pust, and Dr. Ojikutu refused to grant his request for a religious exemption from Boston's Vaccine or Test Policy because they viewed his reasons for the exemption as mere Black American "conspiracy beliefs."

261.   Thereby, the City of Boston, Pust and Dr. Ojikutu treated Mr. Browder differently on the basis of his race and/or national origin, depriving him of equal protection under the Fourteenth Amendment, and causing him injury.

262.   The necessary tendency, if not the specific purpose, of the Vaccine or Test Policy, of the Mandatory Vaccination Policy, and of refusing to grant exemptions based on Black American medical mistrust under either policy, was to drive as many Black Americans as possible out of Boston employment and commerce, in favor of employees of other races.

263. Therefore, the Vaccine or Test Policy and the Mandatory Vaccination Policy had adverse

disparate impact on Mr. Browder on account of his Black race, depriving him of equal

protection under the Fourteenth Amendment, and causing him injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that the City of

Boston, Tammy Pust, and Dr. Ojikutu deprived Mr. Browder of his equal protection rights under

the Fourteenth Amendment, causing him injury; and 2) award Mr. Browder actual damages

against the City of Boston, Tammy Pust, and Dr. Ojikutu, with interest, reasonable attorney's

fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper,

including but not limited to, punitive damages for malicious deprivation of Mr. Browder's rights.

## COUNT V
### 42 U.S.C. § 2000e-2 (Disparate Treatment Discrimination Based on Religion)

264. Plaintiff hereby realleges and incorporates herein all of the allegations contained in

paragraphs 1-263 as if fully set forth herein.

265. Mr. Browder's Black Muslim religion prohibits him from taking the COVID-19 vaccine

and from submitting to biochemical tests of his bodily fluids for any contagious germs.

266. These Black Muslim religious prohibitions conflicted with the City of Boston's Vaccine

or Test Policy, and with the Mandatory Vaccination Policy.

267. Because Mr. Browder did not take the COVID-19 vaccine or submit to biochemical tests

for SARS-CoV-2, the City of Boston placed Mr. Browder on indefinite unpaid

administrative leave, thereby constructively terminating him and causing him injury.

268. The City of Boston could have provided reasonable accommodations to Mr. Browder's

religious beliefs by assigning him jobs that did not require interaction with members of

the public or other firefighters, and therefore would not have resulted in an increased risk

of exposure to or transmission of the COVID-19 virus, SARS-CoV-2, from Mr. Browder to others.

269.   The City of Boston did not offer any reasonable accommodations from the Vaccine or Test Policy to Mr. Browder.

270.   Accommodating Mr. Browder's religious beliefs would not have resulted in undue hardship, even if Mr. Browder had continued to interact with members of the public. This is because COVID-19 vaccines do not prevent exposure to, infection with, and transmission of SARS-CoV-2; and consequently because testing *only* unvaccinated employees for SARS-CoV-2 infection would fail to prevent transmission of the virus among the vast majority of City of Boston employees who were vaccinated.

271.   Therefore, the City of Boston discharged Mr. Browder and otherwise discriminated against Mr. Browder with respect to his compensation, terms, conditions, or privileges of employment, because of Mr. Browder's religion, in violation of 42 U.S.C. 2000e-2(a), causing Mr. Browder injury.

272.   Because Mr. Browder's religious beliefs required Mr. Browder to refuse to submit to biochemical tests for SARS-CoV-2; Local 718 and John Soares told Mr. Browder's employer that they view those beliefs as those of a "loose cannon" and refused to advance Mr. Browder's grievance.

273.   Local 718 and John Soares supported union members whose religions required them to oppose the COVID-19 vaccine, but not those whose religions required them to oppose COVID-19 testing.

274.   Therefore, Local 718 and John Soares discriminated against Mr. Browder because of Mr. Browder's religion and caused or attempted to cause Mr. Browder's employer to

discriminate against Mr. Browder on the basis of Mr. Browder's religion, in violation of 42 U.S.C. 2000e-2(c).

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that the City of Boston, Local 718, and John Soares discriminated against Mr. Browder on the basis of religion in violation of 42 U.S.C. § 2000e-2, causing him injury; and 2) award Mr. Browder actual damages against the City of Boston, Local 718, and John Soares, with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Mr. Browder's rights.

**COUNT VI**
**Mass. Gen. Laws ch. 151B, § 4 (Disparate Treatment Discrimination Based on Religion)**

275.    Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-274 as if fully set forth herein.

276.    The City of Boston discharged Mr. Browder from employment and otherwise discriminated against Mr. Browder in compensation or in terms, conditions or privileges of employment because of Mr. Browder's religious creed, without any basis in a bona fide occupational qualification, in violation of Mass. Gen. Laws ch. 151B, § 4.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that the City of Boston discriminated against Mr. Browder on of his religious creed in violation of Mass. Gen. Laws ch. 151B, § 4, causing him injury; and 2) award Mr. Browder actual damages against the City of Boston, Local 718, and John Soares, with interest, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Mr. Browder's rights.

**COUNT VII**
**42 U.S.C. § 2000e-2 (Disparate Treatment and Impact Discrimination Based on Race)**

277.  Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-276 as if fully set forth herein.

278.  Dr. Ojikutu is motivated by a professional interest in combating vaccine hesitancy, medical distrust, and certain sincerely-held beliefs among Black Americans, which Dr. Ojikutu has deprecated as "conspiracy beliefs" or "conspiracy theories."

279.  Dr. Ojikutu does not have a professional interest in combatting vaccine hesitancy, medical distrust, and certain sincerely-held beliefs among other races.

280.  If Mr. Browder had not been Black American, but instead a member of a different race that is not the focus of Dr. Ojikutu's professional research, she and the City of Boston would not have sought to combat his vaccine hesitancy and medical mistrust beliefs by denying his religious exemption request and placing him on unpaid administrative leave.

281.  Therefore, the City of Boston discharged Mr. Browder, or otherwise discriminated Mr. Browder with respect to his compensation, terms, conditions, or privileges of employment, because of Mr. Browder's race, causing him injury

282.  According to statistically-significant and peer-reviewed nationwide COVID-19 vaccination data for August 2021, when the Vaccine or Test Policy went into effect, Black Americans ha[d] the lowest vaccination rate out of all races, at 25.4% fully vaccinated. In comparison, 33.7 % of White Americans had been fully vaccinated by then.

283.  At least two of the three Boston employees who were put on unpaid administrative leave for refusing to comply with the Vaccine or Test Policy were Black Americans.

284. The Vaccine or Test Policy is not job-related or consistent with business necessity. The stated purpose of the Vaccine or Test Policy was "to minimize exposure to and transmission of the COVID-19 virus in City workplaces by providing occupational protection to all City employees and preventing exposure to members of the community we serve." However, COVID-19 vaccines do not prevent exposure to, infection with, and transmission of SARS-CoV-2; and consequently testing *only* unvaccinated employees for SARS-CoV-2 infection would fail to prevent transmission of the virus among the vast majority of City of Boston employees who were vaccinated.

285. Alternatively to denying sincerely-held belief exemptions to the Vaccine or Test Policy, the City of Boston could have granted such exemptions and assigned employees to jobs that did not require interaction with members of the public or other employees, and therefore would not have resulted in an increased risk of exposure to or transmission of the COVID-19 virus, SARS-CoV-2.

286. The City of Boston did not grant any religious exemptions to its employees from the Vaccine or Test Policy or provide any other alternatives.

287. Therefore, the Vaccine or Test Policy classified Boston employees in such ways that would adversely affect Mr. Browder's status as an employee because of his race, in violation of 42 U.S.C. § 2000e-2(a)(2), causing Mr. Browder injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that the City of Boston discriminated against Mr. Browder with respect to his compensation, terms, conditions, or privileges of employment because of Mr. Browder's race, and classified Boston employees in such ways that would adversely affect Mr. Browder's status as an employee because of his race, causing him injury; and 2) award Mr. Browder actual damages against the City of Boston, with

interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief

that the Court deems proper, including but not limited to, punitive damages for malicious

deprivation of Mr. Browder's rights.

## COUNT VIII
### 42 U.S.C. § 12112 (Americans with Disabilities Act)

288.  Plaintiff hereby realleges and incorporates herein all of the allegations contained in

paragraphs 1-287 as if fully set forth herein.

289.  Because Mr. Browder was not vaccinated against COVID-19, the City of Boston required

Mr. Browder to take COVID-19 tests as a condition of his continued employment.

290.  Because vaccinated employees also can become infected with and transmit the SARS-

CoV-2 virus, testing only unvaccinated employees for SARS-CoV-2 infection was not

related to or consistent with the City of Boston's business necessity of minimizing

exposure to and transmission of SARS-CoV-2, on the one hand.

291.  Therefore, the City of Boston required Mr. Browder to undertake a medical examination

and made inquiries of Mr. Browder as to whether he is an individual with a disability or

as to the nature or severity of the disability, in violation of 42 U.S.C. § 12112(d)(4),

causing Mr. Browder injury.

## COUNT IX
### 42 U.S.C. § 1983 (Procedural Due Process Under Fourteenth Amendment)

292.  Plaintiff hereby realleges and incorporates herein all of the allegations contained in

paragraphs 1-291 as if fully set forth herein.

293.  Since completing a one year probationary period upon being hired as a Boston firefighter

in 2007, Mr. Browder had been a tenured civil service employee.

294.    The Massachusetts civil service law, Mass. Gen. Laws. ch. 31, §§ 1 et seq., protects

tenured civil service employees from being involuntarily "discharged, removed,

suspended for a period of more than five days, laid off, [or] transferred" without just

cause, and without and the procedural protections of Mass. Gen. Laws. ch. 31, § 41.

295.    Mass. Gen. Laws. ch. 31, § 41 requires three days' notice and a hearing prior to

discharge, removal, long-term suspension, layoff, or transfer.

296.    There is no provision in Mass. Gen. Laws ch. 31 authorizing an appointing authority to

place an employee on indefinite unpaid administrative leave. Whatever its basis, because

such a leave constitutes the loss of all job responsibilities and compensation for an

indefinite period of time, it should be regarded as a "discharge" within the meaning of

Mass. Gen. Laws ch. 31, §§ 1, 41.

297.    At close of business on October 27, 2021, while Mr. Browder's request for a religious

exemption from the Vaccine or Test Policy was still pending, the City of Boston notified

Mr. Browder that he must comply with the Vaccine or Test Policy or be placed on

indefinite unpaid administrative leave. Mr. Browder did not receive adequate notice of

what was, in essence, a constructive discharge, and was given no pre-deprivation process

whatsoever.

298.    Mr. Browder's post-deprivation process, which was limited to the November 4, 2021

"non-compliance hearing," was woefully inadequate. Mr. Browder was not allowed to

appeal the denial of his religious exemption, which had been predetermined by Dr.

Ojikutu and Pust. The hearing lasted for only twelve minutes; the employer's

representative was absent from the hearing, and the exercise was otherwise entirely futile.

299.     The City of Boston, Pust, and Dr. Ojikutu violated Mr. Browder's procedural due process

          rights under the Fourteenth Amendment by placing him on indefinite unpaid

          administrative leave without adequate pre-deprivation notice, with no pre-deprivation

          process, and without adequate post-deprivation process, causing Mr. Browder injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that the City of

Boston and Dr. Ojikutu deprived Plaintiff of due process under the Fourteenth Amendment,

causing him injury; and 2) award Mr. Browder actual damages against the City of Boston and

Dr. Ojikutu, with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and

any other relief that the Court deems proper, including but not limited to, punitive damages for

malicious deprivation of Mr. Browder's rights.

## COUNT X
### 42 U.S.C. § 1983 (Takings Clause of the Fifth Amendment)

300.     Plaintiff hereby realleges and incorporates herein all of the allegations contained in

          paragraphs 1-299 as if fully set forth herein.

301.     Since completing a one year probationary period upon being hired as a Boston firefighter

          in 2007, Mr. Browder had been a tenured civil service employee.

302.     That a tenured public employee has a protected property interest in continued

          employment is beyond question.

303.     The stated purpose of the Vaccine or Test Policy was to benefit the public by

          "minimiz[ing] exposure to and transmission of the COVID-19 virus in City workplaces[,]

          by providing occupational protection to all City employees and preventing exposure to

          members of the community we serve." Therefore, the Vaccine or Test Policy and

Plaintiff's loss of income from his public employment as a consequence of the Vaccine Policy were intended for public use.

304. Dr. Ojikutu's private professional efforts to fight medical distrust and conspiracy beliefs among Black Americans are motivated by a public health purpose.

305. By placing Mr. Browder on indefinite unpaid administrative leave for failing to comply with the Vaccine or Test Policy due to his sincerely-held religious beliefs, the City of Boston, Pust, and Dr. Ojikutu effected a taking of Mr. Browder's property for public use without just compensation, in violation of the Takings Clause of the Fifth Amendment, as applicable to the States by the Fourteenth Amendment, causing Mr. Browder injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that the City of Boston, Pust, and Dr. Ojikutu took Mr. Browder's property for public use without just compensation, in violation of the Takings Clause of the Fifth Amendment, as applicable to the States by the Fourteenth Amendment, causing Mr. Browder injury; and 2) award Mr. Browder actual damages against the City of Boston, Pust, and Dr. Ojikutu, with interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Mr. Browder's rights.

## COUNT XI
### 42 U.S.C. § 1985 (Conspiracy to Deprive of Equal Protection of Laws)

306. Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-305 as if fully set forth herein.

307. As part of Dr. Ojikutu's professional efforts to combat medical distrust and conspiracy beliefs among Black Americans, all Defendants conspired for the purpose of depriving

Black Americans who worked for or did commerce in the City of Boston during the
COVID-19 pandemic of the equal protection of the laws, thereby causing Mr. Browder
injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that all
Defendants conspired for the purpose of depriving Mr. Browder of the equal protection of the
laws due to his Black race, causing Mr. Browder injury; and 2) award Mr. Browder actual
damages against Defendants, with interest, reasonable attorney's fees and costs pursuant to 42
U.S.C. § 1988, and any other relief that the Court deems proper, including but not limited to,
punitive damages for malicious deprivation of Mr. Browder's rights.

### COUNT XII
### (Breach of Duty of Fair Representation)

308.   Plaintiff hereby realleges and incorporates herein all of the allegations contained in
       paragraphs 1-307 as if fully set forth herein.

309.   Mr. Browder filed a labor grievance with the City of Boston pursuant to the 2017-2021
       CBA between Local 718 CBA and the City of Boston, as governed by Mass. Gen. Laws
       150E, §§ 5, 8-9.

310.   Local 718 refused to advance Mr. Browder's grievance against the City of Boston, in bad
       faith and in an arbitrary manner, as a consequence of religious discrimination and/or
       personal hostility by Local 718 President John Soares against Mr. Browder, breaching its
       duty of fair representation to Mr. Browder, and causing Mr. Browder injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that Local 718
breached its duty of fair representation to Mr. Browder, causing Mr. Browder injury; and 2)

award Mr. Browder actual damages against Local 718, with interest, reasonable attorney's fees and costs, and any other relief that the Court deems proper.

## COUNT XIII
### (Breach of Contract)

311.     Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-310 as if fully set forth herein.

312.     By placing Mr. Browder on indefinite unpaid administrative leave for noncompliance with the Vaccine or Test Policy while Mr. Browder's request for a religious exemption from the Vaccine or Test Policy was still pending, the City of Boston breached its obligations under the 2017-2021 CBA between itself and Local 718 not to discipline or discharge Mr. Browder except for just cause, as well as not to discriminate against Mr. Browder on the basis of religion, causing Mr. Browder injury.

313.     By abruptly ordering Plaintiff to return to work after nineteen months of unpaid administrative leave, and then terminating Plaintiff by declaring him absent without leave, thereby denying Plaintiff the recourse of an appeal of his termination before the Massachusetts Civil Service Commission and/or Human Resources Division, the City of Boston breached its duty of good faith and fair dealing under the 2017-2021 CBA between itself and Local 718.

314.     Plaintiff exhausted the grievance process under the 2017-2021 CBA between the City of Boston and Local 718 by filing a grievance with the City of Boston, which Local 718 then refused to advance on Plaintiff's behalf.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that the City of Boston breached its contract with Mr. Browder, causing Mr. Browder injury; and 2) award Mr.

Browder actual, reliance, and expectancy damages against the City of Boston, with interest, and any other relief that the Court deems proper.

## COUNT XIV
### (Mass. Gen. Laws ch. 12, § 11I)

315. Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-314 as if fully set forth herein.

316. By his actions, John Soares interfered with Mr. Browder's rights in Counts 1-XII through threats, intimidation or coercion, causing Mr. Browder injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that John Soares interfered with Mr. Browder's rights in Counts 1-XI through threats, intimidation or coercion, causing Mr. Browder injury; and 2) award Mr. Browder actual damages against John Soares, with reasonable attorney's fees and costs pursuant to Mass. Gen. Laws ch. 12, § 11I, interest, and any other relief that the Court deems proper.

## COUNT XV
### (Tortious Interference)

317. Plaintiff hereby realleges and incorporates herein all of the allegations contained in paragraphs 1-316 as if fully set forth herein.

318. By his actions, John Soares interfered with Mr. Browder's employment, advantageous, and/or contractual relationship(s), causing Mr. Browder injury.

WHEREFORE, Mr. Browder requests that this Court: 1) Adjudge and declare that John Soares interfered with Mr. Browder's employment, advantageous, and/or contractual relationship(s), causing Mr. Browder injury; and 2) award Mr. Browder actual damages against John Soares, with, interest, and any other relief that the Court deems proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,
Plaintiff,
By his attorney,

Ilya I. Feoktistov, Esq.
B.B.O. No. 704458
LAW OFFICE OF ILYA FEOKTISTOV
292 Newbury Street, No. 544
Boston, MA 02115
(617) 462-7938
if@ilyafeoktistov.com

DATED: June 19, 2024.